## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

```
-------------------------------------------------------  X
                                                         :
RIVERKEEPER, INC.,                                       :    Case No. _____
                                                         :
                          Plaintiff,                     :    COMPLAINT FOR
                                                         :    DECLARATORY AND
              v.                                         :    INJUNCTIVE RELIEF AND
                                                         :    CIVIL PENALTIES
BENSON METAL CORP.,                                      :
                                                         :    (Federal Water Pollution Control
                          Defendant.                     :    Act, 33 USC §§ 1251 to 1387)
                                                         :
-------------------------------------------------------  X
```

Plaintiff Riverkeeper, Inc. ("Riverkeeper"), by and through its counsel, hereby alleges:

### I.

### INTRODUCTION

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act," "the Act," or "CWA") to address and abate Defendant's ongoing and continuous violations of the Act.

2. Defendant discharges polluted stormwater runoff from its scrap metal recycling facility located at 539-543 Smith Street, in Brooklyn (the "Facility") into waters of the United States without authorization, in violation of Sections 301(a) and 402(p)(2)(B) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B), and has failed to obtain coverage under and comply with the conditions of an individual National Pollutant Discharge Elimination System ("NPDES") permit or the State of New York, General Permit for the Discharge of Stormwater Associated with Industrial Activity ("the General Permit") issued by the New York State Department of

Environmental Conservation ("DEC"), in violation of Sections 402(p)(3)(A) and (p)(4)(A) of the CWA, 33 U.S.C. §§ 1342(p)(3)(A) and (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.     Stormwater runoff is one of the most significant sources of water pollution in the nation, comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the New York Harbor, Long Island Sound, and other receiving waters in this District.  The State of New York has designated more than 6,676 river miles, 317,000 acres of larger waterbodies, 560 square miles of harbors, bays and estuaries, 778 acres of wetland, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

4.     Defendant's stormwater discharges contribute to this endemic stormwater pollution problem.  Defendant engages in industrial activities including the collection, processing, storage, reshipment and resale of scrap metal and related wastes.  Defendant operates and stores industrial equipment including mobile cranes and grapples, and metal shearing and compacting equipment. Defendant's Facility houses scrap piles that are more than forty feet high.  Upon information and belief, these piles contain industrial scrap steel and non-ferrous materials, including but not limited to copper, brass, stainless steel, bronze, zinc and various alloys that are contaminated with industrial pollutants.  The Facility also receives and sorts aluminum, lead acid batteries, and other materials.  In addition, Defendant's Facility is

configured to permit heavy vehicle traffic in and out of the Facility.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby surface waters.  Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      Riverkeeper has complied with the notice requirements under Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1).

7.      On May 13, 2013, Riverkeeper provided notice of Defendant's violations of the Act and of its intention to file suit against Defendant to Defendant; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA's Region II office; and the Commissioner of DEC, as required by the Act, 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Riverkeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

8.      More than sixty days have passed since the notice letter was served on Defendant and the state and federal agencies.

9.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

11.     Venue is proper in the Eastern District of New York pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

### III.

### PARTIES

12.     Plaintiff Riverkeeper, Inc. is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York.  Riverkeeper's mission includes safeguarding the ecological and biological integrity of the Hudson River and its tributaries.  Riverkeeper was originally founded by the Hudson River Fisherman's Association, a group of fishermen concerned about the ecological state of the Hudson River, and the effect of its polluted and degraded condition on fish. Riverkeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums.  Riverkeeper has more than 3,250 members, many of whom reside near to, use and enjoy the Hudson River and the waters and tributaries of New York Harbor, including more than one hundred members that live in close proximity to the Gowanus Canal, which is polluted by industrial stormwater runoff from the Defendant's scrap metal recycling yard.

13.     Riverkeeper's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting.  Many of Riverkeeper's members live near the Gowanus Canal, participate in community activities focused around the Gowanus Canal, and recreate upon

and alongside the waters of New York Harbor, including the Gowanus Canal.  Water quality in the Gowanus Canal (and by extension, in New York Harbor) directly affects the health, recreational, aesthetic, commercial, and environmental interests of Riverkeeper's members.  The interests of Riverkeeper's members are being, and will be, adversely affected by defendants' failure to comply with the requirements of the Clean Water Act.

14.     The relief sought herein will redress the harms to Riverkeeper and its members caused by Defendant's activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain, speedy or adequate remedy at law.

15.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Benson Metal Corp. is a corporation incorporated under the laws of the State of New York that owns and operates the scrap metal recycling facility at 539-543 Smith Street, in Brooklyn.

### IV.

### STATUTORY AND REGULATORY BACKGROUND

#### The Clean Water Act

16.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA Section 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

17.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States without a NPDES permit.  A NPDES permit requires dischargers of pollution to comply with various limitations.

18.     NPDES permits are issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  *See* 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

19.     In New York, DEC has been delegated the authority to issue NPDES permits.


**Stormwater NPDES Permits**

20.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

21.     Section 402(p) establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program.  33 U.S.C. § 1342(p).  Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

22.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

23.     Sections 402(p)(2)(B), (p) (3)(A) and (p) (4)(A) of the Act, 33 U.S.C. § 1342(p)(2)(B), (p)(3)(A) and (p)(4)(A), and the stormwater discharge regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

24.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

25.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow melt runoff, and surface runoff and drainage.

26.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") Code 5093 (the storage, processing, and recycling of scrap iron and metal). Facilities in those industrial categories must obtain NPDES permit coverage for their polluted stormwater discharges.

<u>New York's General Permit for the Discharge<br>of Stormwater Associated with Industrial Activity</u>

27.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current version of the "Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity," Permit No. GP-0-12-001 (the "General Permit") came into effect on October 1, 2012 and remains in effect.

28.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must obtain coverage under the General Permit and comply with its terms, or obtain coverage under and comply with an individual NPDES permit.

29.     To obtain coverage under the General Permit, a facility discharging stormwater associated with industrial activity is required to submit to DEC a registration form called a "Notice of Intent" to be covered under the General Permit.

30.    Before submitting this registration form to DEC, however, a facility discharging stormwater associated with industrial activity must first prepare, make available, and implement a Storm Water Pollution Prevention Plan ("SWPPP").

31.    In order to comply with the General Permit, a facility owner or operator that obtains coverage under the General Permit must reduce the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.  The owner or operator also must comply with numeric effluent limitations on the quantity and concentration of pollutants discharged from the facility established in the General Permit, as well as narrative ("non-numeric") effluent limits established in the General Permit.  In addition, the owner or operator must perform inspections, conduct monitoring and sampling, and meet other requirements of the General Permit.

### CWA Citizen Enforcement Suits

32.    Under CWA Section 505(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.  33 U.S.C. § 1365(a)(1).

33.    Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  *See* CWA Section 505(f), 33 U.S.C. § 1365(f).

34.    Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

35.    Injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a).

36.     Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation (for violations occurring between March 15, 2004 and January 12, 2009), and up to $37,500 per day per violation (for violation occurring after January 12, 2009). *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

**V.**

**STATEMENT OF FACTS**

**Defendant Controls Industrial Activities at the Facility**

37.     On information and belief, the Defendant was incorporated in 1998 and, since then, has operated a scrap metal yard at 539-543 Smith Street.

38.     Because the Defendant controls the industrial activities that take place at the Facility, the Defendant is responsible for managing stormwater at the Facility associated with those activities in compliance with the CWA.

39.     The Defendant is the person, as defined by 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

**Defendant's Industrial Activities Expose Pollutants to Stormwater**

40.     The activities and practices of Defendant at the Facility expose materials and pollutants to stormwater.

41.     The Facility houses large uncovered piles and open containers of scrap metal. Waste materials are stockpiled to heights of more than 40 feet on unpaved ground throughout the Facility.  Upon information and belief, incoming material is dumped on the ground, including industrial scrap steel and non-ferrous materials such as aluminum, copper, brass, stainless steel, bronze, zinc and various alloys.

42.     Through prior use, some of these wastes are contaminated with additional pollutants such as paint and other coatings, used oil, fuel, solvents, other industrial fluids, glues, and battery acid.

43.     Once sorted, most of the materials are moved by cranes and grapplers into massive outdoor piles several stories high.

44.     The Defendant also engages in metal shearing and compacting at the Facility. These operations can reduce larger pieces of metal into smaller shreds, scraps, and particles that are more easily carried by stormwater.

45.     Large metal moving machinery and other heavy vehicles owned by Defendant are also present on site. In addition, Defendant's Facility is configured to permit heavy vehicle traffic in and out of the Facility.

46.     According to the U.S. EPA, moving, stockpiling, processing, and crushing vehicles, metal, or other waste materials often leads to the release of pollutants including: car parts; scrap metal; paint; sediment; crushed glass; copper; lead; zinc; nickel; iron; aluminum; arsenic; cadmium; cobalt; silver; mercury; and other metals, as well as non-metal pollutants of concern and numerous other waste materials. *See* EPA, "Industrial Stormwater Fact Sheet Series, Sector N: Scrap Recycling and Waste Recycling Facilities," available at http://cfpub.epa.gov/npdes/stormwater/ swsectors.cfm.

47.     Machinery on the site can release fuel, oil, hydraulic fluid, lubricants, PCBs, polycyclic aromatic hydrocarbons (PAHs), an array of metals, pH-affecting substances and chemical residues.

48.     On information and belief, active vehicles at the Facility also release pollutants to the environment, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.

49.     Further, vehicles at the Facility track dust, particulate matter, and other contaminants to areas on and off the premises from which these pollutants can enter stormwater and, ultimately, waters of the United States.

50.     Because Defendant fails to adequately shelter and otherwise contain these materials to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, and particulates.  Stormwater captures and carries pollutants when it flows into, over, and out of vehicles, piles of scrap metal or debris, sheared materials, bales of compacted metals, sloped surfaces, open containers, and other equipment and vehicles.  In the process, stormwater can pick up sediment, oil, grease, hydrocarbons, metals, paints, plastic, solvents, nutrients, pathogens, particulates, and other pollutants associated with the Facility's operations.  A number of these pollutants can dissolve or suspend in stormwater.

**Defendant Discharges Stormwater From the Facility to Waters of the United States**

51.     With every rain storm or snow melt, polluted stormwater discharges from the Facility.  Stormwater containing the pollutants described above is conveyed off-site into waters of the United States both directly overland and by infiltration of dissolved metals and other pollutants into and through shallow groundwater that is immediately hydrologically connected to the Gowanus Canal.

52.     The scrap metal yard at 539-543 Smith Street is located directly alongside the Gowanus Canal. The scrap yard rises above the water on an old, partly deteriorated bulwark . Behind the bulwark is a pad upon which the Defendant has placed a concrete block wall to prevent larger material from falling into the canal. Scrap metal processing activities occur behind the wall, except for barge loading.

53.     To load a barge, grapples and cranes loft material over the concrete wall, carry it past the bulwark, and shake it loose onto the waiting vessel in the Gowanus Canal.  Because of such barge loading operations and other dust generating activities in the yard, the concrete pad and bulkhead on the canalward side of the area are routinely coated with dust and pollutant particles that wash into the Gowanus Canal with every rainfall.

54.     The concrete wall is made of very large concrete blocks – about five feet long and two feet high.  The blocks are not mortared together, leaving gaps between them through which water flows.  In wet weather, or on days when the Defendant is using a hose to spray water on piles of scrap metals, water can be seen emerging on the canalward side of the wall, running down from the side and tops of many of the blocks in the wall.  Once on the canalward side of the wall, flowing water makes its way to the Gowanus Canal.

55.     In addition to these surface flows of polluted water into the Gowanus Canal, there is also a significant volume of point source discharge into shallow groundwater that is directly hydrologically connected to the Gowanus Canal.  Typically, stormwater from scrap metal operations carries a number of pollutants that dissolve into stormwater, including metals such as copper, zinc, iron and lead, as well as some hydrocarbons.  The Facility's concrete wall, buildings, vehicles and scrap piles trap and channel polluted stormwater to low, unpaved points where the polluted stormwater infiltrates and drains away.  Approximately 70% of the surface of the Benson scrapyard is unpaved, including the ground underneath the forty foot high piles of scrap metal.

56.     Stormwater that infiltrates into unpaved ground at the Facility is infiltrating directly through a few feet of soil and groundwater that is directly hydrologically connected to

12

the Gowanus Canal.  Thus, pollutants dissolved in stormwater at the Facility migrate quickly into the Gowanus Canal.

57.     Pollutants entering the Gowanus Canal also flow into the larger New York Harbor.

58.     The Gowanus Canal is a "water of the United States," as defined in 40 C.F.R. § 122.2 and, therefore, a "navigable water" as defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

59.     The Gowanus Canal consistently fails to meet state water quality standards.

60.     DEC has designated the Gowanus Canal as an impaired water pursuant to Section 303(d) of the CWA, 33 U.S.C. § 1313(d),  for failure to meet minimum water quality standards due to high oxygen demand (low levels of dissolved oxygen) and the presence of floatables (debris) attributable in part to urban stormwater runoff.  *See* DEC, "Impaired/Delisted Waters NOT Included on the 2012 Section 303(d) List Aug 2012," available at http://www.dec.ny.gov/docs /water_pdf/303d notlisted12.pdf.

61.     On information and belief, stormwater discharges from Defendant's Facility contribute to the ongoing impairment of the Gowanus Canal by releasing oxygen demanding chemicals and other pollutants that contribute directly to the Gowanus Canal's impaired status.

**Defendant has not Obtained Permit Coverage for These Discharges**

62.     As of May 13, 2013, the Facility was not covered by an individual NPDES permit.

63.     As of May 13, 2013, the Facility was not covered by the General Permit.

64.     As of May 13, 2013, Defendant had not filed a registration with DEC seeking General Permit coverage for the Facility.

13

65.     As of May 13, 2013, Defendant had not complied with any provisions of the General Permit.

66.     Accordingly, on May 13, 2013, Riverkeeper sent Defendant via certified mail the notice of intent to sue described above and attached to this complaint.

67.     In response to Riverkeeper's notice, the Defendant prepared a SWPPP dated June 28, 2013.

68.     On information and belief, after preparing the SWPPP, the Defendant subsequently submitted to DEC a Notice of Intent to seek coverage under the General Permit.

69.     On information and belief, the Notice of Intent was not submitted to DEC earlier than June 28, 2013.

70.     In any case, because the General Permit requires that an adequate SWPPP must be prepared *before* a Notice of Intent for permit coverage can be filed, Defendant cannot have submitted a lawful Notice of Intent before June 28, 2013.

71.     A discharger cannot begin to lawfully discharge under the General Permit until at least 30 days after submission of a Notice of Intent.

72.     On information and belief, Defendant has not sought coverage under any other NPDES permit besides the General Permit.

73.     Accordingly, Riverkeeper believes and alleges that, as of the filing date of this complaint, the Facility still lacks NPDES permit coverage.

# VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants
### (Violations of 33 U.S.C. §§ 1311, 1342)

74.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

75.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

76.     Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

77.     Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

78.     Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, industrial wastes, chemical wastes, biological materials, rocks, sand, and garbage discharged into water.

79.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

80.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

81.     40 C.F.R. § 122.2 defines "waters of the United States" to include, among other things:  (i) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) all interstate waters; (iii) tributaries to such waters; (iv) wetlands adjacent to such waters or their tributaries; and (v) all other waters the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce.

82.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i) require that facilities discharging stormwater associated with industrial activity obtain a NPDES permit.

83.     Defendant has discharged and continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

84.     Each and every day on which Defendant discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

85.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper and its members have no plain, speedy, or adequate remedy at law.

86.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Failure to Implement Adequate Control
Measures and Best Management Practices
(Violations of 33 U.S.C. §§ 1311, 1342)**

87.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth

herein.

88.     The General Permit, in Parts I.B and VII, requires that Defendant implement

mandatory general and sector-specific control measures called Best Management Practices

("BMPs") in order to minimize the discharge of pollutants from the Facility.

89.     The selected measures must reduce the discharge of pollution from the Facility to

the extent practicable through use of the best available technology for the industry in order to

comply with both numeric and narrative effluent limits contained in the permit.

90.     For example, the General Permit requires that Defendant minimize the exposure

of pollutants to stormwater (*see* General Permit Part I.B.1.a.2.a) in the first place and, to the

extent that pollutants are exposed to stormwater despite Defendant's best efforts, the Defendant

must also minimize the ultimate discharge of those pollutants in stormwater from the facility. *See*

General Permit Part I.B.1.a.2.f.

91.     In this context, to "minimize" means to "reduce and/or eliminate to the extent

achievable using control measures (including best management practices) that are

technologically available and economically practicable and achievable in light of best industry

practice."  General Permit, Part I.B.1.

92.     To "minimize" the discharge of pollutants as required by the General Permit, the

facility's BMPs must meet the Clean Water Act standards of Best Available Technology

Economically Achievable ("BAT" or "BATEA"), Best Conventional Pollutant Control

Technology ("BCT") and/or Best Practicable Control Technology Currently Available ("BPT"), depending upon the type of pollutant being discharged.

93.     Because the industrial activities carried out at the Facility are categorized in SIC Code 5093, Defendant must also implement the sector-specific control measures specified in Part VIII of the General Permit for Sector N.

94.     Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant has not implemented control measures or BMPs as required by the General Permit to meet the standards of the Clean Water Act.  For example, as discussed above, Defendant has not prevented contact between pollutants and stormwater through roofing or, alternatively, prevented the infiltration of polluted stormwater into the Gowanus Canal via groundwater by collecting and treating all polluted stormwater.

95.     Defendant has failed, and continues to fail, to implement adequate control measures and BMPs at the Facility as required by the General Permit.

96.     Each and every day on which Defendant fails to comply with the General Permit's control measure and BMP requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

97.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper and its members have no plain, speedy, or adequate remedy at law.

98.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Failure to Develop and Implement an Adequate
### Storm Water Pollution Prevention Plan
### (Violations of 33 U.S.C. §§ 1311, 1342)

99.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth

herein.

100.     Part III of the General Permit requires industrial dischargers to develop,

implement and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

101.     As described in Part III.A of the General Permit, the SWPPP must identify

potential sources of pollution that may affect the quality of stormwater discharges associated

with industrial activity.

102.     Further, the SWPPP must describe and ensure the implementation of practices

that minimize the discharge of pollutants in stormwater discharges and that assure compliance

with the other terms and conditions of the General Permit, including achievement of effluent

limitations.

103.     The SWPPP must address, at a minimum: (1) each of the elements set forth in

Part III.C of the General Permit; (2) each of the applicable sector-specific plan elements

specified in Part VIII of the General Permit and, (3) as applicable, each of the additional special

requirements listed in Part III.F of the General Permit for industrial activities that discharge

through a municipal separate storm sewer or to impaired waterbodies, activities that take place at

facilities that report under the federal Emergency Planning and Community Right to Know Act,

and facilities that use secondary containment measures. The SWPPP must include records and

documentation of compliance with each of these elements and requirements.

104.     The SWPPP must be representative of current site conditions and kept up to date.

105.    The SWPPP must be signed in accordance with Part V.H of General Permit.

106.    At an active facility, the SWPPP must be kept on-site at all times.

107.    The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.

108.    Because the industrial activities carried out at the Facility are categorized in SIC Code 5093 (scrap metal recycling), Defendant must include the sector-specific SWPPP elements specified in Part VIII of the General Permit for Sector N (a group of related industrial activities defined by DEC to include activities in SIC Code 5093), in addition to the SWPPP elements set forth in Part III of the General Permit.

109.    Under Part III.D.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

110.    Riverkeeper requested a copy of Defendant's SWPPP on May 13, 2013.

111.    On July 15, Defendant provided a copy of a SWPPP for the Facility to Riverkeeper.  The SWPPP was dated June 28, 2013.

112.    The SWPPP prepared by Defendant and/or its agent or about May, 2012, is inadequate and does not meet the standards for a SWPPP established in the General Permit for several reasons including, but not limited to, the following:

    a.  The SWPPP's inventory of exposed materials and identification of all activities and materials that may be a source of stormwater pollution is incomplete.  The SWPPP does not recognize and address metal shearing and compacting activities as potential sources of pollution.

20

b.  The SWPPP fails to identify shearing and compacting as a dust or particulate generating process.

c.  The SWPPP identifies the infiltration of pollutants into groundwater as a point source of discharge from the Facility, but fails to identify and assign a sampling point for this discharge from which samples will be collected and tested for pollution.

d.  The SWPPP fails to reduce and/or eliminate the discharge of pollutants into groundwater through the use of control measures that represent the best technologies that are available, economically practicable, and achievable in light of best industry practice.  In this respect, industry best practices include: preventing exposure of scrap piles to water by enclosing the yard with a roof; or paving the surface and collecting the discharge rather than allowing it to infiltrate into groundwater; and/or either preventing the release of pollutants into groundwater entirely by reusing the discharge or sending it offsite for treatment, or pre-treating any discharge to surface water that travels through groundwater with filters that substantially reduce the concentration of dissolved and suspended metals and other pollutants.

e.  The SWPPP does not minimize the discharge of pollutants by specifying that piles of scrap, crushed, or waste materials be stored on an impervious containment pad and/or under a roof or waterproof tarp, with a dike, berm, or other physical barrier around the perimeter and/or an inward sloping of the pad to a sump with appropriate outside grading, in order to prevent stormwater run-on and runoff.

f.  The SWPPP fails to establish anything more than a paper version of an inbound

21

recycleable and waste control program to control what is received at the Facility. This is a significant gap because the simplest measure to minimize pollution at a site that receives waste materials from the public is for Facility staff to ensure that materials which create a high risk of pollution when sheared, crushed, or exposed to the elements never enter in the first place.  The SWPPP states that employees will exclude hazardous and other unacceptable materials upon receipt using language taken verbatim from the General Permit, but the SWPPP does not identify any such excluded materials in particular, nor does the SWPPP explain and document *how* employees will ensure that unacceptable materials are excluded in practice. Further, the SWPPP does not describe the training provided to employees regarding excluded materials or annex the training materials that they receive.  The SWPPP's inbound control program does not include such basic practices as requiring that employees inspect all incoming older vehicles, thermostats and other devices likely to contain mercury switches to ensure that any mercury switches have been removed or are promptly removed and disposed of as hazardous waste, nor does the SWPPP state clearly that employees will inspect all incoming refrigeration devices to ensure that they have been properly drained of refrigerant.

g.   The pollution controls in the SWPPP are inadequate because they call for the use of a water hose for dust control, rather than a misting system.  Defendant's current use of a water hose for dust control uses hundreds of gallons more water daily than a misting system would use, and at much higher pressure.  Currently, Defendant's use of a hose for dust control results in direct discharges of

22

wastewater to the Gowanus Canal.

h.  The SWPPP incorrectly states that there is no discharge over the surface to the Gowanus Canal.  The SWPPP fails to identify the pad on the canalward side of the concrete wall as an outfall from which polluted water enters the Gowanus Canal, and fails to require inspection for and periodic sampling of any discharge observed from this area.

i.  The SWPPP does not adopt the industry best management practice of banning all use of solvents at the site for metal or parts cleaning, or restricting such cleaning to a centralized, properly serviced cleaning and collection station located in an enclosed space.

113.  Therefore, on information and belief, as of the filing date of this complaint Defendant had not developed an adequate SWPPP.

114.  Defendant has failed, and continues to fail, to develop, implement and maintain compliance with an adequate SWPPP for the Facility as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

115.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility and to take the other SWPPP-related actions required by the General Permit is also evidenced by, *inter alia*, Defendant's outdoor storage of scrap metals and other waste materials, without appropriate best management practices; the continued exposure and tracking of waste resulting from the operation or maintenance of vehicles and barges at the site, and the failure to either treat stormwater prior to discharge or to implement effective containment practices.

116.  Each and every day on which Defendant fails to comply with the General Permit's SWPPP requirements is a separate and distinct violation of Section 301(a) and Section

402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

117.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper and its members have no plain, speedy, or adequate remedy at law.

118.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

**Failure to Conduct Routine Site Inspections and Comply With General
Monitoring, Recordkeeping, and Reporting Requirements
(Violations of 33 U.S.C. §§ 1311, 1342)**

119.    Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

120.    The General Permit requires industrial dischargers to conduct and document comprehensive site inspections at appropriate intervals, but in no event less frequently than once a year.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.  *See* General Permit, Part IV.A.1.

121.    Records of these inspections must be kept for five years.  *See* General Permit, Part IV.A.2.

122.    In addition, qualified facility personnel must carry out routine inspections at least quarterly.  *See* General Permit, Part III.C.7.b.2.  During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.  *See* General Permit, Part III.C.7.b.1 and b.3.  Such deficiencies must then be addressed through corrective actions.

123.     Further, all covered facilities must conduct multiple types of analytical monitoring as described in Part IV.B of the General Permit and must keep records of their monitoring efforts in accordance with Parts IV.B and IV.E of the General Permit.  The monitoring required under the General Permit includes both various visual inspections and collection and laboratory analysis of water quality samples.

124.     In addition, because Defendant engages in industrial activities that fall within Sector N of the General Permit's classifications of industrial activity, Defendant must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VIII of the General Permit.  *See* General Permit, Part VIII (requirements for Sector N).  These parameters include:

   a.  Total Suspended Solids

   b.  Chemical Oxygen Demand

   c.  Oil & Grease

   d.  Total Recoverable Aluminum

   e.  Total Recoverable Cadmium

   f.  Total Chromium

   g.  Total Recoverable Copper

   h.  Total Recoverable Iron

   i.  Total Recoverable Lead; and

   j.  Total Recoverable Zinc.

125.     Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant had not conducted any of the site inspections, monitoring, and testing required by Parts III, IV, and VIII of the General Permit.

126.     Defendant has failed, and continues to fail, to comply with the inspection, monitoring, and testing requirements of the General Permit.

127.     Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant also has failed to retain records and submit monitoring reports as required by Parts IV and VIII of the General Permit.

128.     Each and every day on which Defendant fails to comply with any of the General Permit's inspection, monitoring, testing, recordkeeping and reporting requirements is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

129.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper and its members have no plain, speedy, or adequate remedy at law.

130.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements
Applicable to Scrap Metal Recycling Facilities
(Violations of 33 U.S.C. §§ 1311, 1342)**

131.     Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

132.     The General Permit contains various requirements specific to scrap metal recycling facilities.  *See* General Permit, Part VIII (requirements for Sector N).  These include:

a.     Prohibitions of non-stormwater discharges from turnings containment areas, of discharges from containment areas in the absence of a storm event, and of wash water discharges;

26

b.   A prohibition on the breaking up of used lead-acid batteries;

c.   A requirement to comply with a separate set of industry requirements for auto salvage yards if any vehicle dismantling occurs on the property;

d.   A requirement to evaluate the applicability of a series of Best Management Practices listed in Part VIII, Sector N of the permit.

133.   Defendant has failed, and continues to fail, to comply with these requirements of the General Permit that apply to all scrap metal recycling facilities.

134.   Each and every day on which Defendant fails to comply with the General Permit's requirements applicable to scrap metal recycling facilities is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

135.   Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper and its members have no plain, speedy, or adequate remedy at law.

136.   Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Failure to Comply with Specific General Permit Requirements Applicable to Facilities that Discharge to an Impaired Waterbody
(Violations of 33 U.S.C. §§ 1311, 1342)**

137.   Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

138.   Discharges to an impaired waterbody are not eligible for coverage under the General Permit if the cause of impairment is a pollutant of concern included in the benchmarks and/or effluent limitations to which the facility is subject unless the facility:

27

    a.   prevents all exposure to stormwater of the pollutant(s) for which the waterbody is impaired,

    b.   documents that the pollutant for which the waterbody is impaired is not present onsite, or

    c.   provides additional information in the SWPPP to minimize the pollutant of concern causing the impairment as specified in Part III.F.4 of the General Permit.

139.    The Gowanus Canal is an impaired water.

140.    One of the causes of impairment is excessive oxygen demand (and thus low dissolved oxygen in the water).

141.    Chemical Oxygen Demand is a parameter included in the benchmarks to which Defendant's facility is subject.

142.    Defendant has not prevented all exposure of substances that create chemical oxygen demand to stormwater.

143.    Defendant has not documented that such substances are not present onsite.

144.    Defendant has not submitted a SWPPP with the additional information specified in Part III.F.4 of the General Permit.  The SWPPP prepared by Defendant does not discuss oxygen demand at all.

145.    Thus, Defendant has failed and continues to fail to comply with the requirements of the General Permit related to discharge to impaired waterbodies.

146.    Each and every day on which Defendant fails to comply with the General Permit's requirements governing discharges to impaired waterbodies is a separate and distinct violation of Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342.

147.    Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper and its members have no plain, speedy, or adequate remedy at law.

148.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

149.    Wherefore, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

(a)    Declare Defendant to have violated and to be in violation of the Act as alleged herein;

(b)    Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

(c)    Order Defendant to immediately comply fully with all applicable requirements of the General Permit (or an individual permit that is at least as stringent);

(d)    Order Defendant to take appropriate actions to remediate the harm caused by the violations of their NPDES permit and the CWA, to the extent possible;

(e)    Order Defendant to pay civil penalties of $32,500 per day per violation for all violations of the Act occurring between March 15, 2004 and January 12, 2009, and $37,500 per day per violation for all violations of the Act occurring after January 12, 2009, as provided by Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

(f)    Order Defendant to pay the costs of litigation, including Riverkeeper's reasonable investigative costs, attorneys fees, witness, and consultant fees, and other costs, in accordance with Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

(g)     Award any such other and further relief as this Court may deem

appropriate.


Dated this 26th day of July, 2013                    Respectfully submitted,
New York, New York


                                                      By:  /s/  Reed Super

                                                      Reed W. Super (RS-3615)
                                                      SUPER LAW GROUP, LLC
                                                      131 Varick Street, Suite 1033
                                                      New York, New York 10013
                                                      (212) 242-2355 (phone)
                                                      (855) 242-7956 (fax)
                                                      reed@superlawgroup.com

                                                      *Attorneys for Plaintiff Riverkeeper, Inc.*